**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 3428; AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, COUNCIL 238,

Plaintiffs,

v.

LEE ZELDIN, in his official capacity as Administrator of Environmental Protection Agency; U.S. ENVIRONMENTAL PROTECTION AGENCY,

Defendants.

CASE NO. ___________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. This lawsuit challenges Defendants' unlawful termination of Plaintiffs' collective bargaining agreement.

2. Plaintiffs are labor organizations representing thousands of federal employees at the U.S. Environmental Protection Agency ("EPA" or "Agency"). While the dedicated civil servants represented by Plaintiffs are working hard every day to advance the Agency's mission to protect human health and the environment, the Agency has turned its back on them, unlawfully eliminating their workplace protections and stifling their free speech rights.

3. In 1978, based on its express finding that "labor organizations and collective bargaining in the civil service are in the public interest," Congress enacted the Federal Service Labor-Management Relations Statute, which established a comprehensive labor-management relations framework governing the federal workforce. 5 U.S.C. § 7101 *et seq*. ("Chapter 71"). For decades, consistent with this statutory framework, Plaintiffs' members have served their country while exercising their rights to join a labor union and collectively bargain over their working conditions.

4. On June 14, 2024, EPA entered into a new collective bargaining agreement with Plaintiffs with a term of June 14, 2024 through June 30, 2028 ("2024 CBA"). *See* Exhibit 1. The new contract was designed to ensure that EPA employees could continue to do their work protecting human health and the environment regardless of who is in power in Washington.

5. To that end, the 2024 CBA included an important new first-of-its-kind "scientific integrity" provision, which prevents the Agency from retaliating against scientists whose findings differ from the political aims of the current President and protects a core value of the EPA that policy follows the science and not vice versa.

6. On March 27, 2025, President Trump issued Executive Order 14251 (the "Exclusion Order"), which purported to apply the national security exemption contained in 5 U.S.C. § 7103(b) to exclude hundreds-of-thousands of employees at a wide swath of federal agencies from the protections of federal labor law. The EPA was encompassed within the scope of the Exclusion Order, but the Exclusion Order did not require any agency to terminate an existing CBA nor did EPA seek to terminate the 2024 CBA at that time.

7. On August 8, 2025, the Agency abruptly decided, without warning, to terminate the 2024 CBA effective immediately. The Agency's actions caused substantial harm to Plaintiffs and their members as numerous rights and benefits enshrined in the CBA were wiped out.

8. Defendants' termination of the 2024 CBA was unlawful for multiple reasons. First, the Agency failed to provide a reasoned explanation for the sudden elimination of Plaintiffs' contractual rights. While the Agency referenced the Exclusion Order, that Order had been issued over four months earlier, and by the government's own admission, did not require agencies like EPA to terminate existing CBAs. Rather, according to the government, agencies "may choose" whether to terminate a CBA. If an agency chooses to take such action, it must at a minimum comply with the requirements of the Administrative Procedure Act ("APA") for reasoned decision making.

9. EPA's termination of the CBA violated the most basic requirements of reasoned decision-making under the APA. EPA did not provide any reasoned explanation for its August 8, 2025 decision to terminate the CBA, effective immediately, months following the issuance of the Exclusion Order. Nor did EPA consider reasonable alternatives, such as allowing the CBA to run at least through its current term. And, EPA entirely failed to consider the reliance interests of

union members jeopardized by suddenly pulling the plug on union protections upon which members were actively relying.

10. Second, the termination of the 2024 CBA violated the First Amendment. The timing and factual circumstances surrounding the termination of the 2024 CBA demonstrate that Defendants' actions were motivated by the desire to stifle political dissent at the Agency against President Trump's agenda – a desire expressed publicly by Administrator Lee Zeldin just one a month before the CBA was terminated.

11. Plaintiffs and their members have engaged in extensive speech and petitioning activity critical of the Administration's policies with respect to the EPA, including signing on to a Letter of Dissent that was published in June 2025 and raised concerns that Administration policies were undermining the EPA's scientific mission to protect human health and the environment.

12. Although Administrator Zeldin immediately lashed out in the press against those who had signed the letter and stressed there would be "zero tolerance" for such views, the Agency did not take disciplinary action against those who had signed the Letter of Dissent until *after* the Agency terminated the CBA, which eliminated contractual safeguards and remedies bargaining unit employees had under the CBA protecting them against retaliation for raising concerns about political interference with the Agency's scientific work.

13. Supreme Court precedent makes clear that even if the Exclusion Order were lawful, a question not raised in this case, and even if EPA was not legally required to maintain a CBA with the union, the Agency had to comply with the APA's reasoned decision-making requirements in terminating the existing agreement. Moreover, under no circumstances is the Agency permitted to terminate the CBA in order to suppress protected speech or retaliate against

those who voiced concerns over the Administration's policies. Defendants' unreasoned and pretextual termination of the CBA violated both the APA and the First Amendment and must be set aside as unlawful.

## JURISDICTION AND VENUE

14. This Court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under the laws of the United States, and under 28 U.S.C. § 1346(a)(2) because Defendants are a United States agency and official.

15. Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201.

16. Venue is proper in this district under 28 U.S.C. § 1391(e) because Plaintiff AFGE Local 3428 resides here and also because a substantial part of the events or omissions giving rise to the claim occurred here.

## PARTIES

17. Plaintiff AFGE Local 3428 ("Local 3428") is a labor organization headquartered at 80 Smith St., Unit A5, Lowell, MA 01851. Local 3428 represents hundreds of EPA employees in this District, including scientists, engineers, attorneys, public affairs specialists, grants and contract specialists, and support staff.

18. Plaintiff AFGE Council 238 ("Council 238") is a labor organization headquartered at 1717 N. Akard Street #130, Dallas, Texas 75201. Council 238 was established in 1980 and represents employees at EPA across the United States in a variety of fields.

19. Plaintiffs' members include biologists, engineers, chemists, lab technicians, lawyers, and scientists who work every day to ensure that Americans across the country have access to clean air and drinking water. Plaintiffs bring this action on behalf of themselves as

organizations and on behalf of their members, who have lost contractual protections at work due to the termination of the 2024 CBA.

20. Defendant EPA is a federal agency of the United States.

21. Defendant Lee Zeldin is the Administrator of EPA. He is sued in his official capacity.

## FACTUAL BACKGROUND

### I. Federal Employees at the EPA Have Had the Right to Join Labor Unions and Collectively Bargain for Decades

22. In 1978, Congress enacted the Federal Service Labor-Management Relations Statute ("FSLMRS"), which established a comprehensive framework governing collective bargaining for federal civil service employees. The FSLMRS is contained within Title VII of the Civil Service Reform Act of 1978 ("CSRA") and codified as Chapter 71 of Title 5 of the U.S. Code ("Chapter 71").

23. In enacting the CSRA, Congress expressly found that "the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them . . . safeguards the public interest" and "contributes to the effective conduct of public business," and therefore "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a).

24. Chapter 71 guarantees employees "the right to form, join, or assist any labor organization, or to refrain from any such activity." 5 U.S.C. § 7102.

25. Chapter 71 also guarantees employees the right to "engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter." 5 U.S.C. § 7102(2).

26. Chapter 71 requires agencies to "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election." 5 U.S.C. § 7111(a).

27. Once labor organizations are certified as exclusive representatives, they must act for "all employees in the unit" and are required to represent the interests of all such employees "without discrimination and without regard to labor organization membership." 5 U.S.C. § 7114(a)(1).

28. Pursuant to the rights granted by Congress in Chapter 71, federal employees at the EPA and other agencies excluded by the Exclusion Order have a long history of joining labor organizations and collectively bargaining with their employers.

29. Employees at the EPA have exercised their right to join labor unions and collectively bargain with their employer for over 40 years. Council 238 is an independent bargaining council formed in 1980. Today, it represents over 8,000 employees at the EPA across the United States. Local 3428 is a local union member of Council 238 representing EPA employees in this District. For decades, Plaintiffs have represented EPA employees by, *inter alia*, negotiating a collective bargaining agreement and successor agreements, arbitrating grievances brought pursuant to the negotiated grievance procedure, representing employees in formal discussions or investigative examinations, litigating employees' collective and individual rights before administrative agencies and in court, advocating for improved working conditions, and generally acting as their exclusive representative.

30. Plaintiffs' most recent CBA with EPA was effectuated on June 14, 2024 and runs through June 30, 2028.

31. The CBA guaranteed important rights and protections for EPA employees. For example, the CBA:

a. Set important terms and conditions for overtime, sick leave, funeral leave, military leave, holidays, and other types of leave for workers in the unit;

b. Imposed safety and health requirements to ensure the welfare of workers in their place of employment;

c. Established protections for workers regarding reduction-in-force actions and procedures;

d. Imposed procedures for and limitations on disciplinary and adverse actions against workers;

e. Provided for an Employee Assistance Program for individuals experiencing health or personal concerns including alcohol or drug abuse, bereavement, crisis intervention, stress, health, family and marital crises, work-life balance, financial issues, and other situations;

f. Established grievance and arbitration procedures to resolve disputes with the Agency over employment matters; and

g. Created a new "scientific integrity" article that established procedures and safeguards to prevent inappropriate interference in scientific work.

32. The CBA was the product of years of negotiations to safeguard essential rights for bargaining unit members.

33. One of the most important rights under the CBA is official time. Plaintiffs have historically used official time authorized by 5 U.S.C. § 7131 or their CBA to engage in

expressive activities such as the representation of their fellow employees in agency-initiated disciplinary proceedings or investigations.

34. Plaintiff representatives have also engaged in union activities while off duty, including legislative advocacy and lobbying at the federal level on behalf of their members to raise issues impacting EPA employees.

## II. The President Exempts Certain Agencies from the FSLMRS but Does Not Require Termination of CBAs

35. On March 27, 2025, President Trump issued Executive Order 14251, which exempted dozens of federal agencies from the requirements of the FSLMRS,[1] purportedly because those agencies had "as a primary function intelligence, counterintelligence, investigative, or national security work" and the FSLMRS could not be "applied to" the agencies "in a manner consistent with national security requirements and considerations." EO 14251, §§ 1(a), 2; *see* 5 U.S.C. § 7103(b).

36. EPA, including its local offices, is one of the agencies that the President sought to exempt from the FSLMRS's coverage under the Exclusion Order. *See* EO 14251§ 2(b).

37. The White House Fact Sheet issued with the Exclusion Order explained that the Exclusion Order was designed to target unions who were deemed to be "hostile" to "President Trump's agenda."

38. Whether the Exclusion Order was a valid exercise of the President's authority under 5 U.S.C. § 7103(b) is the subject of separate litigation. The Exclusion Order did not, however, state that agencies were compelled to terminate extant CBAs and did not mandate that the EPA CBA be terminated before its expiration date. Rather, statements from the

[1] *See* chapter 71 of part III, subpart F of title 5 (5 U.S.C. §§ 7101–7135).

Administration issued contemporaneously with the Exclusion Order confirmed that agencies were not required to terminate extant CBAs.

39. On March 27, 2025, OPM released a guidance document that informed agencies that they should not take certain actions that were contrary to the terms of existing collective bargaining agreements until after those agreements were terminated.[2] Shortly thereafter, OPM published a "Frequently Asked Questions" document advising agencies *not* to terminate any CBAs "until the conclusion of litigation or further guidance from OPM directing such termination."[3]

40. OPM later updated that guidance on August 13, 2025 – six days *after* Defendants terminated the 2024 CBA – but even so did not direct agencies to terminate their CBAs. Rather, it stated that agencies "*may choose* to terminate, abrogate, or repudiate CBAs with [non-NTEU] unions, and should consult with their General Counsels to assess next steps regarding those CBAs." *See AFGE v. Trump*, No. 25-4014, Dkt. No. 34-1 (9th Cir. Aug. 14, 2025) (emphasis added).

41. The Exclusion Order is currently the subject of multiple lawsuits challenging the constitutional and statutory validity of that Order, including a lawsuit filed in April 2025 by the American Federation of Government Employees and other national and international unions in the Northern District of California.[4] Plaintiffs are not parties to that lawsuit. The plaintiffs in the Northern District of California lawsuit brought constitutional and ultra vires claims challenging

---

[2] March 27 Memorandum from OPM Acting Director to Head and Acting Heads of Agencies and Departments, https://perma.cc/H5SN-T5FZ ("March 27 OPM Guidance").
[3] Frequently Asked Questions, Executive Order 14251, https://perma.cc/38KJ-Z7TN.
[4] *AFGE v. Trump*, No. 4:25-cv-3070, Dkt. No. 1 (N.D. Cal. Apr. 3, 2025).

the legality of the Exclusion Order, and did not bring any claims under the APA challenging the termination of the 2024 CBA, which occurred after the filing of that litigation.

## III. EPA Does Not Terminate Its CBA for Over Four Months After the Exclusion Order and Takes Actions Consistent with the Terms of the CBA During that Time

42. After the Exclusion Order was promulgated, the EPA did not immediately terminate its CBA with Plaintiffs. Rather, over four months passed before Defendants terminated the 2024 CBA.

43. In the months following the Exclusion Order, EPA continued to engage in actions required by the CBA, including citing various CBA requirements as the basis for its actions.

44. For example, in April 2025, Agency officials sent notice to union representatives of its stated intent to conduct a reduction-in-force at the Agency. In addition, Agency management continued to allow union representatives to represent employees in conversations with management, continued to authorize official time, continued to process grievances and engage in arbitration, and continued to respond to requests for information from the union.

45. At no point prior to the August 8 termination of the CBA did Agency management advise Plaintiffs that complying with the EPA's contractual obligations interfered with national security requirements or considerations.

## IV. Plaintiffs and Their Members Engage in Speech and Petitioning Activity Opposing Attempts to Politicize the Scientific Mission of the EPA

46. During the first Trump Administration, Plaintiffs frequently voiced opposition to Administration policies that sought to politicize the EPA's scientific work and undermined the mission of the Agency.

47. For instance, Council 238 created a campaign supporting an EPA workers bill of rights during the first Trump administration, which articulated ten rights for EPA employees, including the right to scientific integrity in EPA work, the right to enforce environment laws

without political interference, and the right to support EPA's mission without fear of reprisal. Plaintiffs were also publicly critical of the Trump Administration during the 2018 government shutdown, with union officials repeatedly stressing the harmful impacts of the President's decisions on both EPA employees and the environmental health and safety work of the Agency.

48. The Administration in response sought to repudiate Plaintiffs' CBA and replace it with a series of unilateral management directives. Plaintiffs filed an unfair labor practice charge with the Federal Labor Relations Authority challenging the Agency's actions, and the directives were subsequently withdrawn following the 2020 election.

49. As a result of the political interference and retaliation experienced during the first Trump Administration, when the 2024 CBA was being negotiated, Plaintiffs proposed adding a new "scientific integrity" provision to the CBA. This provision would add specific contractual protections to ensure that EPA employees could fulfill the mission of the Agency to address climate change and protect the environment without political interference.

50. This new provision became Article 2 of the 2024 CBA ("Scientific Integrity Article"). The Scientific Integrity Article expressly stated at the outset that the goal of this new provision was to "empower Agency management and staff to prevent inappropriate interference in scientific work" and ensure the "use of sound science in Agency decision making." The Scientific Integrity Article specifically provided that employees who made "good faith reports" under this provision "shall not be subject to retribution, reprisal, or retaliation by the Agency." The Scientific Integrity Article also expressly reiterated employees' ability to "generally participate in the free flow of scientific information" in their personal capacity "by discussing their work at conferences, meetings, and with the press, provided that they do not misuse their

federal positions by inappropriately using their official titles, sharing nonpublic information, or implying that the Agency or the United States government sanctions their opinion."

51. By including specific whistleblower protections for employees who report scientific misconduct or suspected violation of the Agency's scientific integrity policy, the Scientific Integrity Article would ensure EPA workers could perform their work and advance the scientific mission of the Agency without fear, intimidation, or retaliation. In addition, because the rights and protections set forth in the Scientific Integrity Article were enshrined in the CBA, actions by the Agency that violated those rights could be challenged by Plaintiffs through the CBA's grievance process, which ultimately would require the Agency to justify its conduct to an independent arbitrator.

52. At the time the new CBA was signed, Council 238 stated that the purpose of the Scientific Integrity Article was to provide "protections for any employee asserting their scientific rights." Noting President Trump's attacks on science during his first Administration, Council 238 highlighted the fact that an "independent arbiter, not a political appointee, will determine whether science is being undermined."[5]

53. AFGE Local 704 President Nicole Cantello similarly stated that the Scientific Integrity Article would protect EPA employees from politically-motivated retribution for pursuing science-based work. Otherwise, "there would be nowhere for an employee to go if they're retaliated against for speaking up for science or scientific integrity."[6]

---

[5] *Press Release: AFGE Council 238 Reaches New Contract with the EPA*, AFGE Council 238 (May. 30, 2024), https://perma.cc/5XCZ-J23B.
[6] Erich Wagner, *EPA Union Ratifies Contract to Protect Employees' Scientific Integrity*, Government Executive (June 4, 2024), https://perma.cc/QW69-M6H9.

54. After President Trump returned to office in January 2025, Plaintiffs and their members continued to voice concerns and push back against Agency leadership and the Trump Administration generally.

55. In February of 2025, when the Trump Administration rolled back telework and remote work, Nicole Cantello, President of AFGE Local 704, spoke with the media and said that the union is examining legal options to "vigorously defend the contract."[7] The Union then did just that, filing two grievances with the Agency: one on telework and one on remote work in February 2025.[8]

56. Also in February 2025, Plaintiffs engaged in lobbying and advocacy work on behalf of its members to discuss issues facing its members, including the need to fully staff and fund the EPA's work.

57. On March 25, 2025, Plaintiffs and their members participated in marches in Philadelphia, New York, Boston, Chicago, Dallas, Seattle, and Anchorage to protest staffing cuts to the Agency and the rollback of regulations that protect the health of Americans and their environment.[9]

58. Brad Starnes, President of AFGE Local 3631, was quoted in an article about the protest describing the proposed staffing cuts as a "reckless dismantling." He organized the Philadelphia protest to occur during employees' lunch break.[10]

---

[7] Erich Wagner, *EPA Orders Most Workers Back Within Weeks, Breaking Union Covenants*, Government Executive (Feb. 12, 2025), https://perma.cc/QP5E-TQA4.
[8] Kevin Bogardus, *EPA Union Challenges Trump's Ban on Telework*, E&E News (Feb. 18, 2025), https://perma.cc/34K3-C44P.
[9] *Largest EPA Union Holds Nationwide Action, March Against Attack on Agency*, AFGE Council 238 (Mar. 26, 2025), https://perma.cc/G5ZV-JX8S.
[10] Samantha Maldonado, NYC EPA Workesr Decry Trump Cuts at Lunchtime Walkout, The City Reporter (Mar. 25, 2025), https://perma.cc/H9LK-HTKD.

59. Andrew Kreider, member of Local 3631, was quoted in an article about the protest, criticizing staffing cuts and the termination of grants.[11]

60. Ed Guster, President of AFGE Local 3911, was also quoted in an article about the marches stating "[w]e're fighting for keeping federal employees in their offices doing their jobs, making sure that we're protecting the environment, protecting the air, protecting the land, protecting the water." *Id.*

61. On April 22, 2025, Joyce Howell, Executive Vice President of AFGE Council 238, released a statement condemning Administrator Zeldin's plan to eliminate Environmental Justice workers at the Agency.[12] In that statement, she said "AFGE Council 238 remains committed to fighting back against the Trump administration's efforts to dismantle the EPA."

62. In June of 2025, a union steward with AFGE Local 704 – one of the local unions that comprise Council 238 – organized a letter that voiced opposition to Administration policies ("Dissent Letter"). The Dissent Letter was signed by hundreds of current and former employees of the Agency and sent to Administrator Zeldin and Congress.

63. Citing numerous examples, the Dissent Letter raised concerns that Administration policies were undermining the EPA's mission to protect human health and the environment, abandoning the Agency's commitment to science-based decision-making, and endangering public health.

64. In total, over 100 bargaining unit employees represented by Plaintiffs and covered by the 2024 CBA, signed the Dissent Letter.

---

[11] Sophia Schmidt, *'A Reckless Dismantling': EPA Employees and Supporters March in Philly to Protest Cuts*, WHYY (Mar. 26, 2025), https://perma.cc/7KAL-RVTH.
[12] *Largest EPA Union Condemns Trump Plan to Eliminate Environmental Justice Workers at Agency*, AFGE Council 238 (Apr. 22, 2025), https://perma.cc/JJ2Y-DUET.

65. AFGE Local 3428's President publicly stated that those who signed the Dissent Letter were fulfilling their duty to "uphold the mission of the EPA to protect human health and the environment, which is something our current administration is not doing when they roll back clean air regulations when they cancel funding for clean up sites in overburdened communities. It is the responsibility of our staff to speak up so that the public does not suffer."[13]

66. Agency officials, including the Agency's ethics office, acknowledged that the Dissent Letter was protected speech.

## V. Defendants Terminate the 2024 CBA, Eliminating Workplace Protections and Clearing Path to Punish Political Dissent

67. Following the publication of the Dissent Letter, Administrator Zeldin made clear his desire to punish employees who voiced opposition to the Trump Administration and spoke out against actions by Agency leadership that undermined the Agency's scientific mission.

68. In a written statement to Breitbart News, Administrator Zeldin stated "[w]e have a ZERO tolerance policy for agency bureaucrats unlawfully undermining, sabotaging, and undercutting the agenda of this administration."[14]

69. Administrator Zeldin went on Mornings with Maria and stated "if anyone wants to be inside of an agency like this, they better get on board with the fact that the American public spoke . . . if there are some employees here who want to get left behind that's fine, they're not going to be allowed to stay here undercutting this agenda . . . . Zero tolerance for any agency employees trying to undercut President Trump."[15]

---

[13] Craig, LeMoult, *EPA Employees Disciplined for Signing Letter Criticizing Agency's Focus on Deregulation*, WGBH Boston (Sept. 7, 2025), https://perma.cc/WKS6-PL9F.

[14] Sean Moran, *'Zero Tolerance': EPA Puts Rogue Minority of Staffers on Leave, Launches Investigation into Effort to Upend Will of American People*, Breitbart (July 3, 2025), https://perma.cc/ATM7-N4FN.

[15] Fox Business, *'ZERO TOLERANCE': Lee Zeldin issues fiery response after EPA protest* (YouTube, July 2, 2025), https://www.youtube.com/watch?v=QSUymy3AJY8.

70. Plaintiffs' CBA was an obstacle to achieving Defendants' goal of stamping out political dissent and silencing employees who raised concerns about the direction of the Agency and its impact on the health and safety of the American public. The Agency had specifically expressed frustration with the workplace protections contained in the CBA that provided employees with recourse against arbitrary discipline and improper political intrusions into their work.

71. On March 27, 2025, before the Exclusion Order was published, EPA and other federal agencies affirmatively filed suit in the Western District of Texas against numerous AFGE affiliates that represented employees at the agencies targeted by the Exclusion Order, including AFGE Council 238.[16] In its Complaint, the government specifically called out Plaintiffs' CBA, lamenting that the "CBA includes numerous terms that materially restrict the power of EPA to govern and set policies for its own workforce."[17] The first example that the government highlighted was the Scientific Integrity Article, which the government stated was "designed to empower the agency's career staff vis-à-vis political appointees and to prevent the Trump Administration from rolling back Biden Administration energy and climate policies."[18] The government also stated in the Complaint that it believed the Exclusion Order authorized, but did not require, agencies to terminate existing CBAs.

72. Ultimately, 139 employees were disciplined by the Agency for signing the Dissent Letter. But although this Letter was published in June and Administrator Zeldin

---

[16] *See U.S. Dep't of Def. v. AFGE, AFL-CIO, District 10*, No. 6:25-cv-119, Dkt. No. 1 (W.D. Tex. Mar. 27, 2025).
[17] *Id.* at ¶ 112.
[18] *Id.*

immediately declared that it was a top priority to punish those who had participated, the Agency let two months pass before doing so.

73. Instead, on August 8, 2025, the Agency without warning terminated the 2024 CBA. In its termination notice, the Agency cited an August 1 order from the U.S. Court of Appeals for the Ninth Circuit, which stayed a preliminary injunction of the Exclusion Order, that "the government 'suffers irreparable harm . . . in the national security context' because of the injunction," and to "prevent irreparable harm to national security and consistent with the 9th Circuit Court decision noted above, the EPA determined it is necessary to terminate its contracts with AFGE." *See* Exhibit 2. The Agency, however, gave no explanation for the fact that EPA had not terminated the CBA following issuance of the Exclusion Order, nor had there been any national security-related changed circumstances at EPA that would justify the need to terminate the CBA at that time. And although the termination of the CBA upended workplace protections and eliminated significant contractual rights, the Agency's decision gave no consideration to the reliance interests of Plaintiffs and their members.

74. In fact, the Agency's termination notice was devoid of *any* facts that would support its claim that termination of the CBA was necessary to "prevent irreparable harm to national security." The Agency provided no supporting rationale or explanation for this conclusory assertion. Nor did it cite any facts, events, actions, or changed circumstances that would explain why the scientific work performed by bargaining unit employees now suddenly implicated national security concerns after decades of AFGE union representation at the agency.

75. Terminating the CBA was, however, necessary to ensure that the Agency could take its desired approach in punishing bargaining unit members who had signed the Dissent Letter.

76. Under the terms of the CBA, employees are entitled to have union representatives present in disciplinary meetings with Agency officials and have the right to challenge any discipline imposed through the grievance process. The union further has the right to bring the matter before an impartial arbitrator, who has the power to order the Agency to reinstate terminated workers, award backpay, and other remedies. Furthermore, the Scientific Integrity Article in the CBA specifically protected employees who reported scientific integrity concerns as well as employees' ability to engage in external communications and outside activities in their personal capacity.

77. By terminating the CBA, these crucial protections were wiped out, paving the way for Defendants to punish political dissent and send a message to all employees that harsh consequences awaited those who dared voice concerns about the political undermining of the Agency's scientific mission. In its CBA termination notice, the Agency specifically stated that the grievance arbitration procedures in the CBA were eliminated effective immediately. The Agency's "Collective Bargaining Agreement Termination FAQs" similarly made note that the CBA's due process and disciplinary protections no longer existed, expressly advising employees that they "have no entitlement to a union representative" in disciplinary meeting, all pending grievances "will be considered dismissed," and decisions by independent arbitrators "will be treated as non-binding." *See* Exhibit 3. The FAQs further advised employees that their only recourse now for workplace complaints is an "internal administrative grievance" – meaning only an appeal to the Agency itself.

78. Soon after, the Agency issued discipline against those who had signed the Dissent Letter. Ultimately, at least 16 employees were fired and 119 others were given two-week suspensions without pay. Of the employees disciplined, 110 were covered by the 2024 CBA.

Because the disciplinary action was taken after the CBA was terminated, these employees were not permitted to have union representatives present in disciplinary meetings nor could they or Plaintiffs seek to challenge the discipline through the grievance arbitration process.

## VI. Defendants' Decision to Terminate the CBA Has Had the Desired Effect of Suppressing Political Dissent and Chilling First Amendment Speech

79. While the Agency failed to provide any factual support or reasoned explanation for its decision to terminate the 2024 CBA, it did reinforce one very clear message by its action: dissent would not be tolerated.

80. No longer bound by the obligations of the CBA, the Agency proceeded to take further actions to quash dissent and chill employee speech.

81. In its FAQs issued with the termination of the CBA, the Agency expressly said that it "advises extreme caution" against performing union activities even on *non-duty* time. *See* Exhibit 3.

82. The Agency subsequently informed union officials, under the threat of discipline, that they had to seek preapproval from the ethics office to continue to engage in union activity as volunteers with AFGE even where done off duty, off government property, without government resources, and without compensation from the union.

83. This requirement only arose because the CBA was terminated. The Director of the EPA Ethics Office stated that "any employee who had – prior to EPA's termination of union contracts – served as a union officer in the previous year or had otherwise been engaged in representational activity under 'official time' . . . will fall under this requirement to seek prior approval."

84. This preapproval requirement for "union activities" has caused AFGE members to curtail their participation in lawful, off-duty activity, including associating with a labor organization to pursue common interests and speaking publicly on matters of public concern.

85. Employees now are less likely to engage in spontaneous or unanticipated off-duty union activities because, by their very nature, it is not always feasible to secure agency approval in advance of such activities.

86. The vagueness of the preapproval requirements as to what constitutes "union activities," which EPA has not defined, has also had a profound chilling effect on expression and association. Because it is often unclear whether a certain activity falls under the "union activities" preapproval requirement, some employees have chosen to self-censor and forego the activity rather than risk discipline.

87. Indeed, the Agency has at times taken a nearly limitless view of that term in an attempt to silence speech by Plaintiffs. For example, when AFGE Council 238 President Justin Chen sought clarification of a request for additional documentation regarding his request for time off to serve jury duty, Agency management reprimanded him for sending "union-related communications" using "government-furnished equipment" and stated he had acted contrary to "the guidance previously provided to you" regarding union activities. Similarly, AFGE Local 704 President Nicole Cantello was summoned by Agency management and directed to answer questions about a conversation she had during her lunch hour with a longtime friend and co-worker on the ground that it constituted a "union meeting."

88. That the Agency's actions are intended to target union speech is further evident from the fact that the new ethics rule treats union activity differently than other outside non-profit activities that do not require such approval.

89. EPA's supplemental regulations expressly exempt from its preapproval requirement the uncompensated participation in the activities of a nonprofit organization, such as AFGE. *See* 5 C.F.R. § 6401.103(e). Yet, other uncompensated non-profit organization work, per the text of EPA's own regulation, was not subjected to this requirement. *See also* EPA Ethics Advisory 2005-1 ("Note however that outside employment with a nonprofit organization that is not for compensation, or is only for expenses, is exempt from the prior approval requirement.").

90. The Agency's decision to terminate the CBA and eliminate contractual protections for employee speech has had significant chilling effect on Plaintiffs' members. EPA employees represented by Plaintiffs have expressed concerns with speaking up about workplace issues for fear of retaliation by Agency leadership. Employees have even curtailed their speech during off-duty hours and on their personal social accounts that could be perceived as critical of the Administration for fear that doing so puts a target on their backs.

## CAUSE OF ACTION

### Count I

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious Agency Action

91. The paragraphs above are incorporated and reasserted as if fully set forth herein.

92. Defendants' termination of the CBA constitutes a final agency action under the APA.

93. The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

94. Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

95. In numerous ways, Defendants' termination of the CBA was arbitrary and capricious.

96. EPA failed to meet the most basic requirement of reasoned decision-making under the APA, which is to provide a reasoned explanation for its action. EPA did not adequately explain its decision to terminate the 2024 CBA, only providing a conclusory assertion that it was doing so to "prevent irreparable harm to national security." EPA did not provide any facts or evidence to support this assertion or explain how continuing to abide by the 2024 CBA impacted national security. Nor did the Agency cite any changed circumstances to justify the alleged national security need to terminate the CBA at this time when the Agency had abided by provisions in the CBA for the prior four months after the Exclusion Order was issued. And, EPA did not explain why it was terminating the CBA effective immediately, and not at a later date or when the existing CBA was set to expire. EPA did not provide any explanation at all on these fronts, let alone the "satisfactory explanation" that the APA requires.

97. EPA also failed to consider alternatives to its action as required. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). It did not consider, for example, delaying the effective date of the termination or allowing the CBA to run at least through the expiration of its term, if not longer.

98. EPA also failed to consider the "serious reliance interests" of EPA employees who rely on the CBA and the protections and procedures it provided. *Regents*, 591 U.S. at 30. In terminating the CBA effective immediately, EPA did not consider, for example, the reliance interests of employees impacted by pending union grievances, or who face investigations in

which the employee receives union representation or other support. EPA also did not consider the reliance interests of employees whose concerns that were addressed in quarterly Labor Management Meetings with the union or through informal and formal grievance processes. EPA also did not consider the reliance interests of employees and the union in receiving timely rulings through the use of grievance processes.

99. Accordingly, the Agency's termination of the CBA should be held unlawful and set aside.

**Count II**
**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**Contrary to Constitutional Right**

100. The paragraphs above are incorporated and reasserted as if fully set forth herein.

101. Under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . (B) contrary to constitutional right, power, privilege, or immunity."

102. Defendants' termination of the 2024 CBA is in contravention of the First Amendment.

103. The First Amendment prohibits government officials from retaliating against individuals and organizations based on their protected speech or perceived First Amendment activities. The First Amendment also prohibits the government from seeking to suppress actual or perceived speech or association based on disagreement with the speaker's viewpoint.

104. Plaintiffs and their members have engaged in extensive First Amendment activity in opposition to the current Administration, including through the Dissent Letter, which raised numerous concerns about the politicization of the Agency's scientific mission.

105. The timing and context of Defendants' decision to terminate the CBA, along with the pretextual reference to "national security" considerations, demonstrates that the termination was motivated by the Agency's desire to retaliate against Plaintiffs and their members for their First Amendment activities, squash political dissent, and chill employee speech – consistent with Administrator Zeldin's publicly stated desire to target those who oppose the President's agenda.

**Count III**
**Violation of First Amendment**

106. The paragraphs above are incorporated and reasserted as if fully set forth herein.

107. Separate and apart from the APA, 5 U.S.C. § 706(2), Defendants violate the First Amendment of the Constitution for the same reasons discussed in paragraphs 101-105 above which Plaintiffs incorporate as fully set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

A. Declare unlawful, vacate, and set aside Defendants' unlawful termination of Plaintiff's CBA as a violation of the Administrative Procedure Act and the First Amendment;

B. Enter a permanent injunction prohibiting Defendants from effectuating the August 8, 2025 termination of CBA;

C. Award Plaintiff reasonable attorneys' fees and costs; and

D. Grant such other and further relief as this Court may deem just and proper.

Date: September 29, 2026

Respectfully submitted,

*/s/ Jillian M. Bertrand*

Alfred Gordon O'Connell, BBO # 630456
Jillian M. Bertrand, BBO # 682214
**Pyle Rome Ehrenberg PC**
2 Liberty Square, 10th Floor
Boston, MA 02109
Tel: (617) 367-7200
Fax: (617) 367-7200
agordon@pylerome.com
jbertrand@pylerome.com

Ramya Ravindran*

**Bredhoff & Kaiser, PLLC**
805 15th Street NW, Suite 1000
Washington, D.C. 20005
Tel: (202) 842-2600
Fax: (202) 842-1888
rravindran@bredhoff.com

*Attorneys for Plaintiffs*
**Pro Hac Vice Motion Forthcoming*